THOMAS, Judge.
Jarrod Joel White ("the father") and Kimberly Henderson White ("the mother") were married in 2010. There are two children of the marriage ("the children")-a son ("the son"), born in June 2011, and a daughter ("the daughter"), born in July 2012. The mother also has an older son ("the mother's older son") from a previous relationship. In 2012 the parties separated, and, in November 2012, the father filed a complaint in the Mobile Circuit Court seeking, in pertinent part, a divorce from the mother, an award of custody of the children, and an award of child support.
*887 He also filed a motion in which he alleged that the mother had endangered, or had threatened to endanger, the children and requested an award of pendente lite custody of the children subject to the mother's visitation, exclusive possession of the marital residence while the action was pending, and an award of pendente lite child support. The circuit court held a hearing on the motion and awarded the father the relief he sought, except that it did not order the mother to pay pendente lite child support.[1] Thereafter, the mother filed an answer to the father's complaint and a counterclaim seeking, in pertinent part, a divorce from the father, an award of "primary" physical custody of the children, and an award of child support.
A prolonged period of contentious discovery commenced, during which the father maintained pendente lite custody of the children. Numerous continuances were requested and granted, and the circuit court required the parties to participate in mediation. In May 2016 the circuit court entered an order informing the parties that it would grant no further continuances and setting an August 30, 2016, trial date; however, it later entered an order granting another continuance, setting a November 15, 2016, trial date, and informing the parties that there would be "absolutely no resets."
When the three-day divorce trial began, the son was five years old and the daughter was four years old. The divorce trial began on November 15, 2016, and continued on December 2, 2016. At the close of testimony on December 2, 2016, the circuit-court judge orally acknowledged that the divorce trial had not reached completion and said: "I'm doing away with the [father's pendente lite custody award]. I'm giving [the parents] joint legal custody of their children. It's going to be joint custody. One week with one parent. One week with the other parent." The divorce trial ended on April 18, 2017.
On April 26, 2017, the circuit court entered a final judgment that, in pertinent part, divorced the parties, awarded them joint custody of the children, and ordered them to exchange physical custody of the children on an alternating weekly basis. The circuit court ordered the father to pay the children's health-insurance costs and
"the amount of $1,372.80 each month as child support effective May 1, 2017. (Child support is in compliance with the Guidelines of Rule 32, [Ala. R. Jud. Admin.,] with the split custody.)"
The father filed a timely postjudgment motion. The circuit court held a hearing on the motion and entered an order modifying certain provisions of the judgment that are not relevant to this appeal, and the father filed a timely notice of appeal. He seeks our review of whether the evidence presented supports an award of joint custody of the children, whether the circuit court miscalculated his child-support obligation, and whether the judgment contains an ambiguity that the circuit court refused to clarify.
First, we consider whether the evidence presented supports an award of joint custody of the children.[2] Our legislature has indicated that joint-custody arrangements are favored, § 30-3-150, Ala. Code 1975, and should be considered in every child-custody case, § 30-3-152(a), Ala. Code 1975.
*888 "In original divorce actions, the parties stand on an equal footing with no presumption of entitlement to custody inuring to either parent. See Ex parte Couch, 521 So.2d 987, 989 (Ala. 1988) ; see also Smith v. Smith, 727 So.2d 113, 114 (Ala. Civ. App. 1998). The primary concern in making an initial determination of child custody incident to a divorce action is the best interests of the children. See Couch, 521 So.2d at 989 ; see also C.B.B. v. J.S.D., 831 So.2d 620, 621 (Ala. Civ. App. 2002). To that end, the trial court is given wide discretion in awarding custody and establishing visitation, and its determination of such matters will not be reversed absent a showing of a clear abuse of discretion. See Kovakas v. Kovakas, 12 So.3d 693, 697 (Ala. Civ. App. 2008) ; see also Kent v. Green, 701 So.2d 4, 5 (Ala. Civ. App. 1996).
"The ore tenus rule is based, in part, on the unique position of the trial court to personally observe the parties and witnesses and to assess their demeanor and credibility. See Ex parte Fann, 810 So.2d 631, 633 (Ala. 2001) ; see also Kent, 701 So.2d at 5. Additionally, ' "[i]n child custody cases especially, the perception of an attentive trial judge is of great importance." ' Fann, 810 So.2d at 633 (quoting Williams v. Williams, 402 So.2d 1029, 1032 (Ala. Civ. App. 1981) ). Factors to be considered in making a child-custody award include the age and sex of the children; their emotional, social, moral, material, and educational needs; and the characteristics of those seeking custody, including their age, character, stability, mental and physical health, and their respective home environments. See Ex parte Devine, 398 So.2d 686, 696-97 (Ala. 1981)."
Lowery v. Lowery, 72 So.3d 701, 704-05 (Ala. Civ. App. 2011).
The father testified that he had been unhappy in the marriage because the mother emotionally and verbally abused him, damaged the marital residence by throwing and breaking things in anger, and spoke negatively about him and his family to the children. He also criticized the mother for not attending church or graduating from college and for abusing alcohol, prescription medication, and cocaine.
The mother testified that she had been unhappy in the marriage because the marital residence was unimproved and unsafe and unsanitary for the children. She said that "vagrants" lived in an outbuilding in the backyard, which was cluttered with lumber, nails, paint cans, boats, trailers, and rotting vehicles. She criticized the father for going to bars after work, for not cleaning up after his cats, and for leaving her for four or five days when he was angry with her. She insisted that she had used cocaine only one time.
The father testified that he had decided to seek pendente lite custody of the children after two incidents occurred in 2012. The father said that, while he had been walking their dog, the mother had left the then infant daughter alone in the marital residence, and, he said, the mother had pushed the then less-than-two-year-old son outside on a cold morning to force the father to take him to preschool. The mother testified that those incidents had occurred, but, according to her, she had not known that the father was walking the dog when she left the daughter alone in the marital residence and the son had followed the father outside.
According to the parties, after they first separated they regularly communicated regarding the children's schedules, but the mother added that, although she was in daily contact with the father regarding the children, she had to "beg and plead" with *889 the father to see them. At a certain point during the separation, the parties followed a general pattern whereby the father took the children to day care and the mother picked them up and cared for them until she took them to the father at 6:00 p.m. However, both sets of grandparents and the mother's housekeeper also frequently cared for the children as needed by the parties. According to the father, when the son started kindergarten, his poor behavior had indicated to the father that the son needed a stable routine, so the father, as the pendente lite custodian, decided to change to his having weekly custody of the children and allowing the mother to have weekend visitation every other weekend.[3] The father complained that the mother frequently declined to exercise visitation with the children but also admitted that he had deprived the mother of visitation at times.
The mother said that she wanted an award of "equal access" to the children. According to the mother, the circuit court's mid-trial modification of pendente lite custody had been "wonderful." She testified that she had become involved in the son's school and that, with a few minor exceptions, she had communicated well with the father regarding the children. Kaye Henderson Barr, the mother's mother, testified that, after the mid-trial modification of pendente lite custody, the mother and the children had been "very good, very happy" and the mother's older son had been a positive influence on the son.
The father requested an award of "primary" physical custody of the children. He said that he wanted them to be healthy, safe, well-educated, active in church, and successful. He said that he and the mother each love the children but that she had prioritized work and entertainment over time with them and had endangered them.
The father testified that the mother put the children's emotional health at risk by displaying anger toward him in their presence and by allowing them to spend the night with her and her "boyfriend," Gregory Bass. The mother testified that she had been involved in an extramarital relationship with Bass for four years; that, despite the fact that she was married, she was engaged to marry Bass; and that she did not currently live with Bass but that they had lived together for three months in the past. She said that, during those three months, the children usually slept at her parents' house during her custodial periods, with the exception of "two, possibly three times" and when she and Bass took the children on vacations. She admitted that the children had slept with them in the same bed. Tyler Robertson, a private investigator, testified on behalf of the father. Robertson said that he had observed the mother for two days in 2014 and that, on one of the days, she had left the children alone in her automobile for one minute when she went into a store and for three minutes when she went into a bank.
Dr. Jack Carney testified regarding the father's and the mother's psychological evaluations. Not all of Dr. Carney's observations regarding the mother are favorable. In fact, in addition to other more minor concerns, Dr. Carney indicated that the mother, unlike the father, could not take care of the children without significant support from her family. Dr. Carney agreed that the father was more capable than the mother of taking care of the children and that, if he had to choose one *890 or the other, he would choose the father over the mother as a physical custodian. However, Dr. Carney testified that the mother's family had been unfailingly supportive during the parties' 4-year separation, that they had been supportive of the mother's older son for more than 10 years, and that her situation was "more than adequate."
Dr. Carney recommended an award joint physical custody of the children and testified that the children love both parents. He admitted that he was not aware that the mother had used cocaine on one occasion, that she was planning to marry Bass, and that she might not continue to live near her family. Regardless, Dr. Carney confirmed his opinion that the children enjoyed and benefited from time with both parents, that the parents were healthy, and that the mother's older son was a particularly good influence on the son. Dr. Carney said that the mother's energy matched the son's energy and that the father and both sets of grandparents provided stability.
Factual determinations based on conflicting evidence are within the sound discretion of the trial court. See C.B.B. v. J.S.D., 831 So.2d 620, 622 (Ala. Civ. App 2002). "Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court in a custody hearing." Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala. 1996). This court is not permitted to reweigh the evidence on appeal or to substitute its judgment for that of the trial court. See Ex parte Patronas, 693 So.2d 473, 475 (Ala. 1997). Besides the testimony of the parents, the circuit court had before it evidence demonstrating that the parties had successfully maintained a joint-custody arrangement pendente lite; neither parent testified that the children had been adversely impacted by the mid-trial custody modification. The evidence presented supports an award of joint custody of the children.
We next consider whether the circuit court miscalculated the father's child-support obligation. The circuit court ordered the father to pay $1,372.80 per month in child support and indicated that the "[c]hild support is in compliance with the Guidelines of Rule 32[, Ala. R. Jud. Admin.]."[4] It is well settled that "matters of child support are within the sound discretion of the trial court and will not be disturbed absent evidence of an abuse of discretion or evidence that the judgment is plainly or palpably wrong." Spencer v. Spencer, 812 So.2d 1284, 1286 (Ala. Civ. App. 2001). The father admits, and we agree, that the CS-41 child-support-obligation income statement/affidavit forms submitted by the parties display a lack of precision. The record also contains three CS-42 child-support-guidelines worksheets; however, we have determined that the worksheet submitted by the mother's attorney ("the CS-42 form") is the worksheet that the circuit court relied upon.[5] Our review of the CS-42 form reveals that it suffers from more than one inaccuracy.
*891 However, we conclude that the record contains the requisite forms, and we can determine from the language of the judgment that a calculation in compliance with Rule 32 was attempted. We are not persuaded by the mother's argument in her appellate brief that any alleged error in the child-support calculation was harmless, but we agree with her that the father has waived certain arguments by failing to raise them in his appellate brief. See Asam v. Devereaux, 686 So.2d 1222, 1224 (Ala. Civ. App. 1996). We review the issue as framed by the father.
The father admits that the mother's attorney prepared and submitted the CS-42 form to the circuit court and that he failed to review the CS-42 form; however, he complains that figures used to calculate the child-support obligation are unsupported by the evidence. He points our attention to line 1-his monthly gross income and the mother's monthly gross income-and to line 6-the health-insurance costs. The CS-42 form indicates that the father earns a monthly gross income of $18,180.83, that the mother earns a monthly gross income of $2,916, and that the father pays $600 in health-insurance costs for the children.
The father argued at the postjudgment hearing and argues on appeal that using $18,180.83 as his monthly gross income is unsupported by the evidence. The father testified that his annual gross income varied, but was "in the ballpark of $200,000," which amounts to a monthly gross income of approximately $16,667. On his CS-41 form, the father indicated that his monthly gross income was $15,000. In his deposition, he testified that he earned "[p]robably $220[,000] or so," which amounts to a monthly gross income of approximately $18,334. At the postjudgment hearing, his attorney's argument, in its entirety, was:
"The problem with [the child-support calculation] is that you calculated [the father] at more than his income. The testimony was that he's making at maximum $200,000 a year and the $18,000 [included in the CS-42 from] used is higher than the 18-than the 18,000 that was-I'm sorry-than all of the evidence that was testified to."
On appeal, the father's entire argument is that the circuit court did not use the "correct amount" and that $15,000 "should have been used." Our review of the record reveals that the father's responses to questions regarding his monthly gross income were, at best, vague and that any figure between $15,000 and $18,334 is supported by the evidence presented. Therefore, the father's argument regarding his monthly gross income is unpersuasive.
The father argued at the postjudgment hearing and argues on appeal that using $2,917 as the mother's monthly gross income is unsupported by the evidence. On her CS-41 form, the mother indicated that her monthly gross income was $2,916.67, and she testified that she worked part-time earning $20 per hour in her family's business. She said that she worked 18 to 20 hours per week on weeks that she had custody of the children and 30 hours per week on weeks that the father had custody of the children; thus, by our calculations, the mother testified that she earned an average monthly gross income of approximately $2,123.[6] She said that her employer owned the house in which she lived and that she did not pay rent, that her employer paid her monthly cellular-telephone bill, and that she did not know who paid her utility bills. She testified that her automobile was paid for and that the father paid for her automobile insurance. She said: "I
*892 pay for groceries, gas, clothing, [and] extracurricular activities for my children." The father testified that the mother "is living in a house rent-free, getting free utilities, [and] bills are being paid for by other people."
In his postjudgment motion, the father pointed the circuit court to Rule 32(B)(2)(a), which defines "gross income" as "income from any source, and includes, but is not limited to, salaries, wages, commissions, bonuses, dividends, severance pay, pensions, interest, trust income, annuities, capital gains, Social Security benefits, workers' compensation benefits, unemployment-insurance benefits, disability-insurance benefits, gifts, prizes, and preexisting periodic alimony." The father argued that the circuit court should add "at least $2,000" per month to the mother's income to reflect that her family gave her gifts; however, the circuit court did not recalculate the child-support award. On appeal, the father points this court to Rule 32(B)(4), which defines "other income" and provides that "in-kind payments received by a parent in the course of employment ... shall be counted as income if they are significant and reduce personal-living expenses." The father urges us to reverse the judgment and remand the cause with instructions to the circuit court to recalculate the child-support award by adding $2,000 to the mother's monthly gross income as in-kind payments.
The father cannot point this court to any testimony or documentary evidence demonstrating that the value of the alleged gifts or in-kind payments provided by the mother's family or her employer were any specific amount, and certainly not exactly $2,000 per month. Therefore, we conclude that the father failed to meet his burden of proving that the mother's monthly gross income should be increased by $2,000.
Therefore, the father's arguments regarding his monthly gross income and the mother's monthly gross income are unpersuasive. The circuit court's findings regarding the parties' respective incomes results in a combined adjusted gross income is $21,098, which exceeds the uppermost limits of the child-support schedule. As a result, the circuit court should not have applied Rule 32 to calculate child support in the present case. See Comment to Rule 32, Ala. R. Jud. Admin. (as amended to conform to the amendments effective October 4, 1993). We have explained:
" 'When the parties' combined income exceeds the uppermost limit of the child-support schedule, the determination of a child-support obligation is within the trial court's discretion. Floyd v. Abercrombie, 816 So.2d 1051, 1057 (Ala. Civ. App. 2001) ; Dyas v. Dyas, 683 So.2d 971 (Ala. Civ. App. 1995). "[A] trial court's discretion is not unbridled and ... the amount of child support awarded must relate to the reasonable and necessary needs of the children as well as to the ability of the obligor to pay for those needs." Dyas v. Dyas, 683 So.2d at 973.' "
Wright v. Wright, 19 So.3d 901, 906 (Ala. Civ. App. 2009) (quoting McGowin v. McGowin, 991 So.2d 735, 741 (Ala. Civ. App. 2008) ).
On appeal, the father has not advanced any argument that the circuit court abused its discretion by setting child support at $1,372.80 per month or that the evidence does not support the conclusion that that amount is an inappropriate child-support obligation based upon the reasonable and necessary needs of the children and the father's ability to pay for those needs. Thus, those arguments are waived, Asam, 686 So.2d at 1224, and we conclude that the circuit court's award of child support is due to be affirmed. In light of our conclusion, we pretermit consideration of the father's argument regarding the children's health-insurance costs. See *893 Favorite Mkt. Store v. Waldrop, 924 So.2d 719, 723 (Ala. Civ. App. 2005) (stating that this court would pretermit discussion of further issues in light of dispositive nature of another issue).
Last, we consider the father's assertion that the circuit court refused to clarify the provision in the judgment regarding the "right of first refusal." That provision reads, in pertinent part: "Each parent is always the first choice as a care-giver for any time in excess of four hours. The Court does not consider time spent with the children's grandparents as 'babysitting.' " The father's argument regarding this issue is unsupported by any authority, and this court could affirm on that basis alone. See Smith v. Smith, 196 So.3d 1191, 1198 (Ala. Civ. App. 2015) (citing Allsopp v. Bolding, 86 So.3d 952, 960 (Ala. 2011) ). Regardless, the provision of which the father complains is quite clear that neither parent violates the terms of the divorce judgment if he or she allows the children to spend more than four hours with grandparents during a custodial period. The father does not present a legal argument by asserting that, during the mother's custodial periods, he "should have physical custody before maternal grandparents or other relatives" or that the children should spend any night with him that they are not spending with mother in her home. The father's assertion that the circuit court refused to clarify its judgment is unsupported and unpersuasive.
For the foregoing reasons, the circuit court's judgment is affirmed. We also grant the mother's request for an award of attorney fees in the amount of $3,000.
AFFIRMED.
Thompson, P.J., and Pittman, Moore, and Donaldson, JJ., concur.

The circuit court also appointed a guardian ad litem for the children.

To the extent that our recitation of the parties' testimony might seem inconsistent, we note that the father testified before the mid-trial modification of pendente lite custody and that the mother testified after the mid-trial modification of pendente lite custody.

The father testified that the son's behavior improved within one month of his allowing the mother to have biweekly weekend visitation; however, other testimony indicated that the son might require specialized educational services if the son's aggressive, impulsive, and sexualized behaviors continue.

Although the circuit court ordered the father to pay $1,372.80, Rule 32(C)(3), Ala. R. Jud. Admin., provides, in pertinent part: "All dollar amounts used in child-support calculations under this rule, including the recommended child-support order, shall be rounded to the nearest dollar ...."

The second and third CS-42 child-support-guidelines worksheets were created by the father's attorney and were presented to the circuit court as attachments to the father's postjudgment motion. Both indicate that the father earns a monthly gross income of $15,000 and that he pays $800 in insurance costs. One indicates that the mother earns a monthly gross income of $2,916.57, and the other indicates that the mother's monthly gross income is $3,800.

Earning $20 per hour for an average of 19 hours for 26 weeks equals $9,880; earning $20 per hour for an average of 30 hours for 26 weeks equals $15,600. ($9,880 + $15,600 = $25,480.) $25,480 divided by 12 equals $2,123.